EXHIBIT E

## SHELLI RANDALL  12/1/2021

### Page 1

```
 1              PROTECTIVE ORDER
 2
 3          IN THE UNITED STATES DISTRICT COURT
 4             FOR THE DISTRICT OF KANSAS
 5
 6   LINDA ARMSTRONG,
 7          Plaintiff,
 8   vs.              Case No. 2:21-CV-02258
 9   ENNIS BUSINESS FORMS
10   OF KANSAS, INC.,
11          Defendant.
12
13
14
15
16          DEPOSITION OF SHELLI RANDALL, a Witness,
17   taken on behalf of the Plaintiff, pursuant to
18   Notice, on December 1, 2021, at the Law Offices of
19   Lathrop GPM LLP, 2345 Grand Boulevard, Suite 2200,
20   Kansas City, Missouri 64108, before
21
22             CHERIE L. HOUSE
23
24   Registered Professional Reporter, Certified Court
25   Reporter of the States of Kansas and Missouri.
```

### Page 2

```
 1             APPEARANCES
 2   For the Plaintiff:
 3       Ms. Courtney M. Stout
         WILLIAMS DIRKS DAMERON LLC
 4       1100 Main Street, Suite 2600
         Kansas City, Missouri 64105
 5       (816) 945-7110
         cstout@williamsdirks.com
 6
 7   For the Defendant:
 8       Ms. Rebecca "Beckie" S. Yocum
         Ms. Jill Waldman
 9       LATHROP GPM LLP
         2345 Grand Boulevard, Suite 2200
10       Kansas City, Missouri 64108
         (816) 460-5657
11       rebecca.yocum@lathropgpm.com
         jill.waldman@lathropgpm.com
12
13   Also present:
14       Mr. Dan Gus, General Counsel for Ennis, Inc.
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1             TABLE OF CONTENTS
 2                                Page
 3   Stipulation                   5
 4   SHELLI RANDALL
        Examination by Ms. Stout   5
 5
 6   Certificate of Reporter       215
     Letter                        216
     Errata Sheet                  217
 7   Signature of Witness          218
 8
 9
10             EXHIBITS
11   Exhibit        Description         Page
      No.
12
       5    Layoff Documents (3 pages)        60
13
       6    Pay Change Request (1 page)       77
14
       7    Plaintiff's First Request for     79
15          Production of Documents to
            Defendant Ennis Business Forms of
16          Kansas, Inc. (10 pages)
17     8    Ennis, Inc.'s Position Statement  91
            (5 pages)
18
       9    Defendant's Responses and         129
19          Objections to Plaintiff's First
            Requests for Production of
20          Documents (13 pages)
21     10   E-mail:  03/20/2020               132
            From:  Wade Brewer
22          Bates D000353 and D000354
            (2 pages)
23
       11   Plaintiff Linda Armstrong's First  165
24          Set of Interrogatories to
            Defendant Ennis Business Forms of
25          Kansas, Inc. (9 pages)
```

### Page 4

```
 1     12   Defendant's Answers and Objections   173
            to Plaintiff's First Set of
 2          Interrogatories (16 pages)
 3     13   SHRM Documents (26 pages)            192
 4     14   SHRM Checklist:  Reduction in        193
            Force (RIF) Strategy and Selection
 5          (3 pages)
 6     15   Personnel Change Notice -            207
            4/13/2020
 7          (1 page)
 8   Reporter's Note:  The exhibits were returned to
     Ms. Stout.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SHELLI RANDALL  12/1/2021

Page 5

```
 1                   STIPULATION
 2             IT IS STIPULATED AND AGREED by and between
 3     the respective parties hereto that said deposition
 4     shall be signed by the witness before the time of
 5     trial of this case.
 6                P R O C E E D I N G S
 7             (The deposition commenced at 9:06 a.m.)
 8                  SHELLI RANDALL,
 9     a witness, being first duly sworn, testified under
10     oath as follows:
11                   EXAMINATION
12     BY MS. STOUT:
13         Q.   Ms. Randall, my name is Courtney Stout and
14     I represent Linda Armstrong.  Do you understand
15     that?
16         A.  Yes.
17         Q.   And can you please state your name for the
18     court reporter?
19         A.   Shelli Randall.
20         Q.   And can you please spell it?
21         A.   Sure.  Shelli, S-H-E-L-L-I, Randall,
22     R-A-N-D-A-L-L.
23         Q.   And, Ms. Randall, do you understand that
24     you're testifying under oath this morning?
25         A.  Yes.
```

Page 6

```
 1         Q.   And you understand that even if we take a
 2     break, which we will, when you come back from that
 3     break, you are still under oath?
 4         A.  Yes.
 5         Q.   And therefore you are required to testify
 6     truthfully and accurately?
 7         A.  Yes.
 8         Q.   Have you ever been in a deposition before?
 9         A.  Yes.
10         Q.   And how many times?
11         A.   Probably two.  I couldn't tell you
12     exactly.  It's been a few years.
13         Q.   When were they?
14         A.   It would have been probably 25 to 30 years
15     ago.
16         Q.   Were they both about the same case?
17         A.   No.
18         Q.   What was -- let's start with just one of
19     them.  Tell me what one of the cases was about.
20         A.   Workers' compensation.
21         Q.   And was that when you were with Ennis?
22         A.   No.
23         Q.   What company were you with at that time?
24         A.   Gene Bicknell.
25         Q.   And did you file a workers' comp claim?
```

Page 7

```
 1         A.   No.  I was the employer.
 2         Q.   Okay.  And you said that was about 25, 30
 3     years ago?
 4         A.  Yes.
 5         Q.   And was there just one deposition?
 6         A.  Yes.
 7         Q.   And did that case get resolved?
 8         A.  Yes.
 9         Q.   Okay.  And what was the second time that
10     you've been deposed?
11         A.   A work comp case again.
12         Q.   Were you at Gene Bicknell?
13         A.  Yes.
14         Q.   And was that you filing it?
15         A.   No.  I was the employer again.
16         Q.   Okay.  And did that case get resolved?
17         A.  Yes.
18         Q.   Okay.  So you've been through depositions
19     before?
20         A.  Yes.
21         Q.   But since it's been a few years, I'm just
22     going to go over the rules again.
23         A.   Absolutely.
24         Q.   I apologize if it's redundant.  As you can
25     see, we've court reporter here that is taking down
```

Page 8

```
 1     the questions that I ask and your answers and any
 2     objections that your attorneys make; so it's really
 3     important for her benefit that we do the best that
 4     we can to not talk over each other.  Can you do
 5     that?
 6         A.  I will try.
 7         Q.   I will also try.  There will be times that
 8     we both do it, but we'll just agree to do our best,
 9     okay?
10         A.   Right.
11         Q.   The court reporter also cannot record
12     nonverbal answers.
13         A.  Yes.
14         Q.   So please "yes," "no," or some type of
15     verbal response.
16         A.  I understand.
17         Q.   And then this is an important one:  I'm
18     going to do my best to ask questions that are clear
19     and easy to understand, but I will inevitably ask a
20     confusing or a bad question.  If you don't
21     understand my question, can you please agree to tell
22     me that?
23         A.  Yes.
24         Q.   And then I will rephrase.  And again, if
25     you don't understand when I rephrase, will you
```

Page 25

1   Q.   How to extend your benefits, how to
2   maintain health insurance, that type of information?
3       A.   Yes.
4       Q.   Did you provide any information about the
5   reason for termination?
6       A.   I'm not understanding what you're asking.
7       Q.   Sure.  Sure.  Let me ask it in a different
8   way.  Outside of the insurance forms and the benefit
9   information, did you provide any documentation that
10  spoke to the reason or reasons that that particular
11  employee was being laid off?
12      A.   That would be up to Mike Allen to explain
13  to them.
14      Q.   Okay.  But is it your testimony that you
15  did not provide any paperwork on that issue?
16      A.   The paperwork that stated they were
17  terminated and it stated their insurance, and that's
18  what it stated.
19      Q.   Okay.  Understood.  And it could be -- I
20  could be being dense here; so just help me out.  So
21  the paperwork that said they were being terminated,
22  I understand that you also gave them papers about
23  their insurance and benefits --
24      A.   We also let them know that they were
25  available for the $600 unemployment benefit due to

Page 26

1   COVID.
2       Q.   Okay.  Did they get any documentation that
3   said -- just using a fake name -- John Smith, you
4   are terminated because sales declined at Ennis?
5       A.   I do not do that paperwork.  That is not
6   something I would be privy to to get that
7   information.
8       Q.   But you just testified that you do the
9   termination paperwork, right?
10      A.   But I don't give a reason for that.
11      Q.   Does anyone give a reason for that?
12      A.   That would be Mike Allen who would explain
13  that to the employee at the time.  The documentation
14  I send for, our corporate office explains it was a
15  layoff due to COVID.
16      Q.   Oh, okay.  So -- I want to follow up on
17  two things you said.  Thank you for that
18  information.  So Mike Allen, does he -- so you just
19  testified that he explained --
20      A.   I was not there when those happened.  I
21  only did the paperwork; so I cannot speak for him.
22      Q.   Understood.  And you may not know, but do
23  you know if he gave them any paperwork that said why
24  they were terminated?
25      A.   Again, I was not there.  I can't speak for

Page 27

1   him.
2       Q.   Okay, I understand.  You said something
3   about corporate paperwork that --
4       A.   If we terminate an employee, we do a PCN,
5   which is a personnel change notice, that we send to
6   the payroll department that explains why we're
7   terminating someone.
8       Q.   And we'll get into that in a little bit,
9   but your counsel did produce that to us.  Outside of
10  that personnel change notice, is there anything else
11  that you file for your particular offices?
12      A.   Each office is ran different.  I don't
13  know what you're asking.  I'm not physically at
14  Colorado; so I can't testify to anything that was
15  given in Colorado.  I can only tell you what was
16  done in Kansas and Missouri, as I was there to
17  handle those.
18      Q.   Understood.
19          Did you file any corporate paperwork for
20  the Ennis of Colorado reduction in force?
21      A.   The PCN.
22      Q.   Was that the only paperwork?
23      A.   And I would have terminated their
24  insurance in the system.
25      Q.   Okay.  And is there a document that you

Page 28

1   use to do that as well?
2       A.   Yes.
3       Q.   Okay.  Okay.  I want to now ask you about
4   Forms Manufacturing, and that's in Girard, Kansas?
5       A.   Um-hum.
6       Q.   Did --
7       A.   Yes.
8       Q.   -- Forms -- thank you.  Did Forms
9   Manufacturing engage in a reduction in force?
10      A.   Yes.
11      Q.   When did they do that?
12      A.   In April.
13      Q.   April 2020?
14      A.   Yes.
15      Q.   Were you -- did you have any meetings
16  about that reduction in force?
17      A.   Yes.
18      Q.   When were those meetings?
19      A.   Probably the end of -- March, April, in
20  that time.
21      Q.   March, April 2020?
22      A.   Yes.
23      Q.   Did you have more than one meeting?
24      A.   No.
25      Q.   And who was in that meeting?

Page 29

1  A. Orn Humble, our plant manager, and then
2  Mike Allen, who was on the phone.
3  Q. Orn Humble is the Forms plant manager?
4  A. He was at the time.
5  Q. Okay. Were you in person at that meeting?
6  A. Yes.
7  Q. And Mike Allen was on the phone?
8  A. Yes.
9  Q. Where does Mike Allen live?
10 A. Colorado.
11 Q. Okay. Is he in Denver?
12 A. Yes.
13 Q. Okay. So during that one meeting in March
14 or April of 2020, what was discussed?
15 A. That we will be laying off.
16 Q. Did they give a reason why?
17 A. Due to our financials.
18 Q. Can you elaborate on that?
19 A. I can't.
20 Q. Okay. Did they say anything about sales
21 declining?
22 A. Yes.
23 Q. Did they say how much?
24 A. No.
25 Q. Did they have any documentation they

Page 30

1  referenced?
2  A. That's information I don't have.
3  Q. At the meeting that you were in, did you
4  see any documentation about sales?
5  A. He was on the phone; so I wouldn't have
6  been able to see any documents he had.
7  Q. Okay. So Orn did not -- was not showing
8  you any documents?
9  A. No.
10 Q. How many -- if you know, how many
11 employees were laid off at the Forms plant?
12 A. I do not remember at this time.
13 Q. All right.
14 A. I could look it up.
15 Q. Where would you go to look that up?
16 A. I would have to refer to my records.
17 Q. Okay. And what records are those?
18 A. The personnel records.
19 Q. The -- the personnel change notice?
20 A. Um-hum.
21    MS. YOCUM: Yes?
22    THE WITNESS: Yes.
23 Q. (By Ms. Stout) And I'm not sure if I
24 asked this; so I'm going to jump back to the Ennis
25 of Colorado. At that meeting when it was you and

Page 31

1  Mike Allen regarding Ennis of Colorado's reduction
2  in force, did you all discuss how you were going to
3  select the employees?
4  A. All he did was call and give me the names
5  of people he said he was laying off. That was the
6  meeting.
7  Q. He did not tell you how he selected those
8  names?
9  A. No.
10 Q. And then turning to Forms Manufacturing,
11 how did you all select who to terminate?
12 A. That would have been a selection of --
13 we -- the most people that we needed that could run
14 the most machines --
15 Q. Okay. So --
16 A. -- and most skilled.
17 Q. Okay. Let me repeat back to make sure I
18 understand. You wanted to keep the most skilled
19 employees, correct?
20 A. Yes.
21 Q. And you said the employees that are most
22 skilled -- and I don't want to put words in your
23 mouth, so please correct me if I'm wrong -- the
24 employees that are most skilled are the employees
25 that are able to operate multiple machines; is that

Page 32

1  right?
2  A. Yes.
3  Q. Okay. Do you know how many employees were
4  terminated -- or were laid off during that reduction
5  in force with the forms manufacturing plant?
6  A. No.
7  Q. Would that be something you would check
8  your records?
9  A. Yes.
10 Q. I think I may have asked you that, I
11 apologize.
12    Okay. So I want to switch back to your --
13 to talk about your position as an HR manager at
14 Ennis at Fort Scott.
15 A. Yes.
16 Q. What are your job responsibilities as an
17 HR manager?
18 A. Hiring, benefits, workers' compensation.
19 I do a lot of IT stuff, counseling employees when
20 they're upset, and then I process the paperwork if
21 terminations are done. I enter paperwork. I'm a
22 support person for our GM.
23 Q. On your -- when you do termination
24 processing, you mentioned paperwork -- and I'm
25 talking just about Ennis Fort Scott -- is the only

Page 33

1   paperwork you do is a personnel change notice?
2       A.   No.  We turn in the insurance information.
3       Q.   Oh, yes, thank you.
4           Outside of the personnel change notice and
5   the insurance and benefits information, is there any
6   other paperwork that you process as part of your
7   policy for terminations?
8           MS. YOCUM:  Courtney, let me just --
9       you're talking about terminations versus layoff, and
10      as you know, people get terminated for different
11      reasons.  And so I would like for you to clarify
12      what kind of termination you're talking about.
13          MS. STOUT:  Yes.
14      Q.  (By Ms. Stout)  Let me ask -- I'm going to
15  ask about the layoffs in general in a moment, but
16  let me ask, just in general, when an employee is
17  terminated, outside of the benefits information and
18  outside of the personnel change notice, is there
19  anything else that is your policy to document?
20      A.   Documentation is the forms that we give to
21      the employee.  We give the employee a termination
22      form that explains the insurance when it terminates,
23      again the life insurance, that.  They sign their
24      final time sheet, which explains the remainder of
25      vacation that they have and what is paid out to them

Page 34

1   and what is accrued; and then we give them -- if
2   they are eligible for retirement, we give a
3   retirement form explaining to them that you're
4   eligible for the company-paid retirement that was
5   paid to you; and you can apply for this if you meet
6   these parameters, and then I give them a form that
7   tells them how to apply for unemployment.
8           (Ms. Waldman exited the conference room.)
9           MS. YOCUM:  I think she's confused.
10          Ms. STOUT:  Yes.
11          MS. YOCUM:  Could you clarify that,
12      terminations for cause as opposed to --
13          Ms. STOUT:  Right.
14      A.   I give the exact same forms whether it was
15  a layoff or termination.  Those exact same forms are
16  given to the employee.  The only difference for this
17  was, due to COVID, we allowed them to extend their
18  insurance, and that was the additional form they
19  would sign to extend their insurance for the month.
20      Q.  (By Ms. Stout)  I understand.  Thank you.
21  So I'm taking the COVID out of the picture for a
22  moment.  I'm just talking, if an employee is
23  terminated because they did something bad, there was
24  some misconduct, is there any additional form that
25  is filed?

Page 35

1       A.   No.
2       Q.   No?
3           If an employee -- again, taking away the
4   COVID, just in general pre-COVID life, if an
5   employee is terminated and they did nothing wrong
6   but they are terminated, is there any additional
7   paperwork other than what you've spoken to?
8       A.   No.
9       Q.   Okay.  Now my question is a little bit
10  different now.  Now we're talking in the COVID world
11  with -- with the layoffs in April of 2020.  Was
12  there any additional paperwork provided to the
13  employee other than what you've spoken of?
14      A.   That would be the additional insurance
15      form I spoke of, that they be allowed to carry their
16      insurance for the length of the month.
17      Q.   Understood.  Thank you.
18          Is there anything additionally other than
19  the forms you gave the employee and the personnel
20  change notice that you filed in your records from
21  the layoff?
22      A.   No.
23      Q.   Okay.  Is part of your employment with
24  Ennis, do they provide you with a cell phone?
25      A.   Yes.

Page 36

1       Q.   Do you send text messages on that cell
2   phone about work?
3       A.   Sometimes.
4       Q.   Do you get your work e-mail on that phone?
5       A.   Yes.
6       Q.   Do you respond to e-mails on that phone?
7       A.   Yes.
8       Q.   Do you take work phone calls on that
9   phone?
10      A.   Yes.
11      Q.   Okay.  To the best of your memory, have
12  you had any communication, whether that's e-mail,
13  phone, or text message, about Ms. Armstrong on your
14  work phone?
15      A.   Yes.
16      Q.   Have you had -- the same question, but
17  instead of Ms. Armstrong, have you had any
18  communication, text, phone, call or e-mail about
19  this lawsuit on your work phone?
20      A.   Yes.
21      Q.   Okay.  And do you have a separate cell
22  phone you use for personal life?
23      A.   Yes.
24      Q.   Ennis, Inc., we've referred to as the
25  corporate parent company; is that right?

9 (Pages 33 to 36)

SHELLI RANDALL  12/1/2021

Page 37

```
 1      A.   Yes.
 2      Q.   Where is Ennis, Inc., located?
 3      A.   Midlothian, Texas.
 4      Q.   Where is that?  I'm not familiar with
 5  that.
 6      A.   Outside of Dallas.
 7      Q.   Is it a suburb?
 8          MR. GUS:  Yes.
 9      A.   Yes.
10          MS. STOUT:  Thank you.  So the corporate
11  representative said, yes, it is a suburb.  We
12  appreciate that.
13      Q.   (By Ms. Stout)  So I want to talk now
14  about the extent that Ennis Corporate plays --
15  Ennis, Inc. -- plays in your day-to-day operations.
16  How -- on an average week, how many -- or how much
17  communication do you have with anyone at the
18  corporate office?
19      A.   We can speak with them daily depending
20  on -- because we have an IT department and we have
21  IT issues, we speak to them usually a lot.
22      Q.   Okay, understood.  So you call Ennis
23  Corporate when you have IT issues?
24      A.   Yes.
25      Q.   Is that at any of the five plants that you
```

Page 38

```
 1  supervise?
 2      A.   Yes.
 3      Q.   Outside of IT issues, do you talk with
 4  Ennis Corporate weekly on HR matters?
 5      A.   That is a hard question to answer as it
 6  comes to the needs when I need to ask questions.
 7      Q.   Understood.  Yeah, I understand.
 8          If you have HR questions, do you go to
 9  Ennis Corporate?
10      A.   That depends on the nature of the
11  question.
12      Q.   If you were going to terminate -- and I'm
13  talking just termination right now, not the
14  layoffs -- if you were to terminate an employee, do
15  you have to talk to Ennis Corporate before you do
16  that?
17      A.   I do not make those decisions.  Mike Allen
18  does.
19      Q.   Okay.  Mike Allen makes decisions who to
20  terminate?
21      A.   Yes.
22      Q.   Is he over those five plants as well?
23      A.   He's over four of them.
24      Q.   Which four is Mike Allen over?
25      A.   Ennis of Colorado, Ennis Business Forms of
```

Page 39

```
 1  Kansas, Forms Manufacture, and Witt Printing.
 2      Q.   So he's not over Adams McClure?
 3      A.   No.
 4      Q.   Okay.  But that one is in Colorado, right?
 5      A.   Yes.
 6      Q.   Do you -- and you may not know -- and
 7  that's fine -- do you know if Mike Allen has to talk
 8  to Corporate to -- before he terminates an employee?
 9      A.   I do not.
10          MS. YOCUM:  Objection, form.
11      A.   I do not.
12      Q.   (By Ms. Stout)  Okay.  Does Corporate set
13  any type of human resources policies that you and
14  your five plants have to comply with?
15      A.   Yes.
16      Q.   And what types of policies are those?
17      A.   They would be general running policies.
18      Q.   And you'll have to forgive my ignorance.
19  I've never worked inside a company in your level; so
20  what would a general running policy be?
21      A.   A policy would be on -- we have a workers'
22  compensation policy and how we process and take care
23  of that; we have policies on our hiring, you know,
24  our paperwork that we require to go through; we have
25  employees sign off on a code of conduct -- those
```

Page 40

```
 1  types of forms.
 2      Q.   If you know, do you know if those are the
 3  same at all of the Ennis, Inc., companies?
 4          MS. YOCUM:  Objection to form.
 5      Q.   (By Ms. Stout)  You can answer, if you
 6  understand.
 7      A.   I assume they are.  I do not know.
 8          MS. YOCUM:  Objection.  I'm sorry, I spoke
 9  over you, but did you get that?
10          (The reporter read back the following:)
11          QUESTION:  "If you know, do you know if
12  those are the same at all of the Ennis, Inc.,
13  companies?"
14          "MS. YOCUM:  Objection to form.
15          QUESTION:  "You can answer, if you
16  understand."
17          ANSWER:  "I assume they are.  I do not
18  know."
19          MS. YOCUM:  I don't think she finished.
20  She said, "I assume," and then she started to say
21  something, and that's what I think is missing.
22      Q.   (By Ms. Stout)  Could you repeat your
23  answer, please?
24      A.   I do not know.  That would be something
25  that Corporate would have to answer.
```

10 (Pages 37 to 40)

SHELLI RANDALL  12/1/2021

Page 153

1    A.   PCN, personnel change notice.
2    Q.   And that is the only document?
3    A.   Yes.
4    Q.   Okay.  No document explaining why they
5    were laid off?
6    A.   The PCN states it was a layoff.
7    Q.   Anything else?
8    A.   No, ma'am.
9    Q.   Okay.  Are there any notes from the
10   meeting that you have with the employee when you lay
11   them off?
12   A.   I have the documentation that I hand them
13   and they sign and that is it.
14   Q.   You don't take any handwritten notes?
15   A.   I don't have a need to.
16   Q.   Okay.  And you've never taken handwritten
17   notes when you have laid off an employee with
18   respect to reduction in force, right?
19   A.   When we lay someone off, there's not a lot
20   of conversation.  They walk in, we let them know
21   that their employment is terminating, I explain the
22   paperwork I'm handing to them, they sign it, and
23   it's done.
24   Q.   So is that -- there's no paperwork that --
25   no notes that you take?

Page 154

1    A.   Correct.
2    Q.   And you haven't -- to the best of your
3    knowledge, every layoff you've proceeded over
4    regarding reduction in force, you have taken no
5    notes about it?
6    A.   Correct.
7    Q.   And you have never given the employee
8    that's laid off any documentation explaining the
9    reason for the layoff?
10   A.   No, ma'am.
11   Q.   That's a -- that's a -- I want to make
12   sure.  I asked a double negative.  There's no
13   documents about the reason for the layoff; is that
14   correct?
15   A.   Correct.
16   Q.   Correct.
17        No documents about sales decline?
18   A.   Ma'am, I have nothing to do with sales.
19   Q.   But you don't hand them a document that
20   says:  Here's our sales --
21   A.   Why would I do that?
22   Q.   Can you answer my question?
23   A.   No.
24   Q.   Okay.  Let me ask one more question about
25   the 2008-2009.  Did you talk to anyone other than

Page 155

1    Steve Kelso about this reduction in force?
2    A.   No.
3    Q.   No one at Corporate?
4    A.   No, ma'am.
5    Q.   No one at your plant?
6    A.   Ma'am, we talked to the employees and my
7    GM, and that is it.
8    Q.   Okay.  So I'm just going to refer you
9    back, if you'd like, to interrogatory -- or the
10   request for production.  So Ennis Fort Scott's
11   position is that e-mail that we looked at,
12   Exhibit 10, that is the only communication about the
13   layoffs from Corporate; is that your understanding?
14   A.   I don't understand that.  That's the first
15   time I've seen it; so I do not know if there were
16   any other communication.
17   Q.   Understood.
18        You have not seen any other communication?
19   A.   Correct.
20   Q.   Do you find that strange?
21   A.   No.
22   Q.   So there's a plantwide layoff for an
23   alleged decrease in sales and there's no documents
24   about that, correct?
25        MS. YOCUM:  Objection, misstates her

Page 156

1    testimony and form.
2    Q.   (By Ms. Stout)  To your knowledge?
3    A.   No, ma'am.
4    Q.   And that does not seem strange to you?
5    A.   No, ma'am.
6    Q.   In 20 years in HR?
7    A.   My GM makes the decisions, and I report to
8    him.  That's my job.
9    Q.   Do you ever question his decisions?
10   A.   I've questioned my boss on numerous
11   things, but once he makes the decision, that is not
12   my decision to make.  It is my job to implement his
13   decisions.
14   Q.   Did you question him about the reduction
15   in force?
16   A.   No.
17   Q.   Did you ask him where he's getting his
18   information?
19   A.   No.
20   Q.   So you took him at his word without any
21   documentary support?
22   A.   Yes.  He's my boss.
23   Q.   And I may have asked you this -- and I
24   don't recall if I did, forgive me -- did your
25   company Fort Scott plant, first, have any policy

39 (Pages 153 to 156)

Page 157

1  about how to handle a reduction in force?
2       A.   No, ma'am, not in the current handbook.
3       Q.   Has there ever been a policy?
4       A.   There was one prior.
5       Q.   When was that?
6       A.   When Mr. Kelso was there prior.
7       Q.   Do you remember what year?
8       A.   He left in 2009.
9       Q.   Okay.  So that policy would have been
10  effective during the 2008-2009 reduction in force?
11      A.   Correct.
12      Q.   Did you follow that policy?
13      A.   That was Mr. Kelso's decision to make and
14  follow the policy.
15      Q.   Do you know if he did?
16      A.   I cannot answer for Mr. Kelso.
17      Q.   Did you look at the policy to see if
18  everything was done according to the books?
19      A.   Ma'am, we did exactly what we did:  We
20  reduced our force to the last two hired.
21      Q.   I appreciate that.  My question is did you
22  look at the policy to see if you were complying with
23  it?
24      A.   I didn't need to do that, ma'am.  I
25  understand it.

Page 158

1       Q.   You did not look at the policy?
2       A.   I don't need to look at the policy when
3   you understand it and you know it.
4       Q.   What is the policy?
5       A.   At that time we did it based on the -- the
6   people that were hired and the reduction of how
7   their skill and how the skill fit in.
8       Q.   Is that what the policy said?
9       A.   I do not know word for word what the
10  policy said.  That's my understanding.
11      Q.   Well, you just testified that you know you
12  did it according to policy.
13      A.   That I understood, the policy that I
14  understand, my understanding.
15      Q.   Can you explain your understanding of the
16  policy?
17      A.   I can't.
18      Q.   So you know that you followed the policy,
19  but you don't --
20      A.   I assume I did from the fact that
21  Mr. Kelso did what he was supposed to do.  I'm
22  trusting my GM to do his job.
23      Q.   Okay.  I just want to back up for just a
24  moment.  I'm a little confused.  Did you or did you
25  not review the policy about reduction in force for

Page 159

1   the 2008-2009 reduction in force?
2       A.   Mr. Kelso took that.  That was his
3   decision to make and that was his to do.  I only
4   typed the paperwork and processed it at that time.
5       Q.   So you did not look at the policy?
6       A.   My roles have changed since Mr. Kelso has
7   left.  That was not my role at that time.  That was
8   his.
9       Q.   As HR manager, is it your testimony that
10  it was not your role to review a policy related to
11  termination?
12      A.   It is a policy to review.  It was
13  Mr. Kelso's decision to make.
14      Q.   I'm trying to determine if you did or did
15  not review the policy.
16      A.   I did review the policy.
17      Q.   Did you review it at the time of the
18  2008-2009 layoff?
19      A.   I can't recall.
20      Q.   So you don't recall?
21      A.   Correct.
22      Q.   So your prior testimony, that you said you
23  reviewed, that's untrue?
24      A.   I do not know what you're asking.  You're
25  twisting it around.  I don't understand.

Page 160

1       Q.   Sure.  I don't want to confuse you, and I
2   apologize if I am.  It's not my goal.  I just want
3   to know what you did or did not review, and it
4   sounds like you don't recall if you reviewed it or
5   not; is that true?
6       A.   I do not recall.  At that time Mr. Kelso
7   made a decision and I implemented it.  That's what
8   happened.
9       Q.   And you did not take it upon yourself to
10  review a policy related to termination?
11           MS. YOCUM:  Objection, this has been asked
12  and answered numerous times.  Let's move on, please.
13           You can answer one last time.  Did you
14  review the policy or not?
15      A.   That was Mr. Kelso's decision to make that
16  choice.
17      Q.   (By Ms. Stout)  Is that a yes or no?
18      A.   Mr. Kelso made that decision.  I can't
19  answer for him.
20      Q.   Is it your testimony that you did not
21  review the policy or you don't recall?
22      A.   I don't recall.
23      Q.   Okay.  Okay.  Is that policy still in
24  force today?
25      A.   No.

SHELLI RANDALL  12/1/2021

Page 161

1      Q.   When did that policy end?
2          A.   I just said when Mr. Kelso left, there was
3     a change.
4      Q.   And what change was that?
5          A.   The policy -- the handbook was updated.
6      Q.   And that was -- the portion of the
7     reduction in force policy was taken out?
8          A.   Yes.
9      Q.   And that was approximately 2009?
10         A.   Approximately.
11     Q.   Okay.  And no policy on reduction in force
12    has been put in place since then?
13         A.   Correct.
14     Q.   Okay.  Do you think there should be a
15    policy about a reduction in force?
16             MS. YOCUM:  Objection, form.
17     Q.  (By Ms. Stout)  You can answer.
18         A.   I have no opinion at this time.
19     Q.   As an HR manager, you have no opinion
20    about a policy that relates to termination?
21             MS. YOCUM:  Object, it misstates
22    testimony.
23             You may answer.
24         A.   At this time I don't have an opinion for
25    you.

Page 162

1      Q.  (By Ms. Stout)  Okay.  If you could look
2     at -- we're still on Exhibit 9, Request of
3     Production No. 12.  That's on page 7.  Do you have
4     that in front of you?
5          A.  I don't need to.  Just go through it.
6      Q.   Okay.  I'm going to read it to you:  All
7     documents that contain the selection criteria for
8     determining which employees would be terminated
9     during the period March 1, 2020, through
10    December 31, 2020, at the facility where Plaintiff
11    worked.
12         A.   Okay.
13     Q.   Do you -- so my question for you is --
14            MS. YOCUM:  I'm sorry which request?
15            MS. STOUT:  I'm on No. 12, page 7.
16     Q.  (By Ms. Stout)  So I'm going to read to
17    you the response.  There's an objection -- or an
18    objection part, but I'm going to read to you the --
19    the second half.  That's:  To the extent this
20    request is not objectionable, to the extent that
21    Defendant understands the request, Defendant states
22    that it selected employees for termination within
23    Plaintiff's business unit based solely on their
24    ability to operate multiple machines and presses.
25            Is that your understanding for the reason

Page 163

1     for the layoff in 2020?
2          A.   Yes.
3              MS. YOCUM:  Objection, misstates prior
4     testimony.
5      Q.  (By Ms. Stout)  I'm sorry, I didn't hear
6     your answer.
7              MS. YOCUM:  Misstates prior testimony.
8      Q.  (By Ms. Stout)  Do you -- I didn't get
9     your answer either.
10         A.   I didn't answer.
11             THE REPORTER:  Actually, I heard you give
12    an answer.  You said yes.
13     Q.  (By Ms. Stout)  Is that your answer, yes?
14         A.   I don't know what you're asking me.
15     Q.   Sure.  So my question is here in the
16    responses is that Ennis Fort Scott has said:  The
17    reason that we terminated was based on ability to
18    operate multiple machines and presses.
19         A.   That's correct.
20     Q.   Is there any other reason that you know
21    of?
22         A.  No.
23             MS. YOCUM:  Wait a second.  You misread
24    that to her.  It states that:  Defendant states it
25    selected employees for termination.

Page 164

1             MS. STOUT:  Isn't that what I said?
2             MS. YOCUM:  No.
3             MR. GUS:  No.
4             MS. YOCUM:  You said the reason for the
5     termination.  This is not the reason for the
6     termination.
7             Ms. STOUT:  For the record, I read it and
8     then summarized when she asked.  So let's go and be
9     proper, by the book.  Let me read it again.
10     Q.  (By Ms. Stout)  To the extent this request
11    is not objectionable and to the extent Defendant
12    understands the request, Defendant states that it
13    selected employees for termination that are within
14    Plaintiff's business unit based solely on their
15    ability to operate multiple machines and presses?
16         A.   Correct.
17     Q.   Is there any other reason that you know of
18    for the layoff?
19         A.  No, ma'am.
20            MS. YOCUM:  Wait a second.  For -- the
21    reason for the layoff is not the same as the
22    selection for the layoff.  You're confusing her,
23    okay?
24     Q.  (By Ms. Stout)  For the -- I apologize, I
25    didn't mean to confuse you.  That was just

41 (Pages 161 to 164)